JAMES SURGET et al. *vs.* DOE, ex dem. PETER LITTLE.

A patent to land is evidence that all the preliminary steps have been taken to justify its issuance, and it raises the presumption that every legal requisite has been performed.

If a patent be irregularly issued, it lies with the party who attacks it to show the irregularity.  4 How. 13, cited and confirmed.

An authenticated copy of the official map of the surveyor-general of the land office, with his certificate of its correctness, is competent evidence to prove the identity and description of land conveyed by patent.

A declaration made by A. that B.'s land extends to a certain point, accompanied with acts of forbearance to go beyond that point, is evidence that the point designated is the boundary of the land.

Our statute (H. & H. Dig. 347) would seem to give a sanction to conveyances made by married women under the requisite ceremonies.

The certificates of confirmation constitute evidence of title to the land embraced therein.

IN error from the circuit court of Adams county; Hon. Stanhope Posey, judge.

This was an action of ejectment brought by Peter Little, to recover forty feet of land on Silver Street, in "Natchez under the hill," lying between a lot confirmed to William Lintot, on the corner of Porter and Silver streets, and the lot or store of Sorias & Cozzens.

This forty feet he claims under a patent from the United States, to the legal representatives of Henry Willis, by virtue of an entry by Willis's heirs, under two acts of congress of 1820, and a patent for fractional section 77, in T. 7, R. 3 west, containing 21 84-100 acres, agreeably to the returns of the surveyor-general; and a deed from Anna McComas, wife of Josias H. McComas, and sole heir of H. Willis, deceased, executed before

the date of said entry and patent, to G. Pease; and a deed from G. Pease and wife to Peter Little.

And also under a certificate of payment for 21 84-100 acres of land, paid to the register of the land office, under the pre-emption act of 1830, for fractional section 77, in T. 7, R. 3 west, by Peter Little.

These titles are excepted to, 1st, because there are no " returns of the surveyor-general" showing the existence of any such fractional section 77, in township 7, R. 3 west; and 2d, if the diagram from the approved map, and the courses and distances copied into the diagram, as certified by Bradford, the surveyor of the land office, are evidence of said returns, and of the exist-ence of such fractional section 77, that said fractional section was not open to private entry under either of the acts of 1820, in favor of Willis's heirs, or the preëmption act of 1830, the same having been reserved from sale or entry, by the acts of 1803 and 1804, and finally, by the act of 1806, granted to the city of Natchez.

To rebut the evidence, that this land claimed as fractional section 77, was reserved from public sale by the acts of 1803 and 1804, and granted to the city of Natchez by the act of 1806, Peter Little introduced a deed of compromise between the city of Natchez and Jefferson College in 1826, in relation to a portion of the land front of the city. This deed of compro-mise was objected to, as any evidence of title in Little, or as tending to prove that the land south of Third South street was not embraced in the grant to the city of Natchez by the act of 1806. The objection was overruled, and excepted to.

The defendants below, as heirs of Bernard Lintot, their grand-father, set up an older title to this forty feet of land lying between the lot confirmed to William Lintot, and the lot of Sorias & Cozzens.

This title is a certificate of confirmation to the heirs of Ber-nard Lintot, of the upper half of a grant to Rebecca McCabe, of 8 14-100 poles wide, which R. McCabe assigned to William Lintot, and William Lintot assigned to Bernard Lintot. The lower half of said grant, " by a line parallel to the two sides," having been previously conveyed by R. McCabe to An. Scan-

lan, and by Scanlan to L. Smith, and by L. Smith to John Walton, and which was confirmed to Walton by a certificate of confirmation of the same date with the said certificate for the upper half, to the heirs of Bernard Lintot.

*J. Winchester*, for plaintiffs in error, filed an elaborate brief.

*Montgomery & Boyd*, for defendant in error, made an elaborate argument.

*J. T. McMurran*, on the same side.

Mr. Chief Justice SHARKEY delivered the opinion of the court at January term, 1850.

This action of ejectment was brought by the defendant in error for a lot in that part of Natchez which lies below the bluff, containing forty feet fronting on Silver street, which is the eastern boundary, and the Mississippi river bounds it on the west. Little claims to have derived title from Mrs. Anna McComas, who was the heir at law of Henry Willis, deceased. On the 8th of May, 1820, congress passed an act authorizing the legal representatives of Henry Willis to enter a certain quantity of land, without payment, in any of the land offices in Alabama or Mississippi; under which act Mrs. McComas entered fractional section No. 77, in township No. 7 of range 3 west, containing 21 84-100 acres, for which a patent issued in the name of Willis's representatives, on the 5th of October, 1821. The lot in question is claimed as a part of this fractional section. The declaration contains a demise from Mrs. McComas, and also one from Peter Little. The patent and a conveyance from Mrs. McComas to Pease, and from Pease to Little, were introduced, and also a plat or diagram copied from a map of the township in the surveyor-general's office, with a certificate appended.

The points raised during the trial in the court below, are embraced by the several questions discussed in the argument which has been addressed to us in behalf of the plaintiff in error.

It is insisted that the patent and deeds should have been excluded for three reasons:—1st, because there was no such fractional section as 77 in township 7, range 3 west; 2d, if it ever existed, it was not open to entry under the acts of congress in favor of Willis's representatives, or under the preemption law of 1830; 3d, if it existed, and was open to entry by Willis's heirs, Mrs. McComas, the sole heir, conveyed before she had a legal title, and whilst she was a *feme covert*, and her subsequently acquired interest in the land did not pass by her deed.

In the first place, it is insisted, that if such a fractional section ever existed, it did so by a survey of the township into sections and fractional sections, by a deputy-surveyor, and by being properly designated and described on a plat made out by the surveyor-general from the field notes of the deputy-surveyor, describing the courses, distances, and corners, which plat must have been recorded in the office, in books kept for that purpose. By the act of congress of 1796, which regulated the sale of land in the north-western territory, provision was made for the appointment of a surveyor-general, who was directed to engage a suitable number of deputy-surveyors. The land was directed to be run out into townships containing thirty-six square sections of six hundred and forty acres each, where such square form was practicable, or into fractional sections where it was not. These deputy-surveyors were directed to return their surveys and field books to the surveyor-general, from which he was to make out a description to be transmitted to the officers appointed to sell the land. He was also to cause a fair map or plat to be made out, which was to be recorded in books to be provided for that purpose. The sections were to be numbered, beginning in the north-east section of the township. 2 Laws, U. S. 534. By the act of 1803, provision was made for surveying and selling the land in the Mississippi territory, under the same rules which had been prescribed for the north-western territory. As it was necessary to set apart the land held under private claims, this last act directed that they should be first surveyed. H. & H. Dig. 748, § 10, 11. These private claims of course made it impossible, in many instances, to lay off the public lands into

11 *

square sections, containing six hundred and forty acres. This accounts for what are called fractional sections; where a private claim interfered with a section, so as to diminish its quantity of acres, it left a fractional section. As each private claim was numbered on the map as a section, the numbers in many instances of course exceeded the regular number of square sections contained in a township. The fractional sections were, by the first act, directed to be sold with the adjoining section; but by the act of 1800, they were to be sold separately. 3 Laws, U. S. 386, § 3.

These several provisions furnish answers to several objections which were made in the argument. They show, also, the character of the map which is made out by the surveyor-general. It will be seen that each section has its appropriate number; that it is known and distinguished by its number, and the number of its township, and its identity cannot be mistaken. This number is the description, and the only description used in the certificates of entry and patents. No other calls are given, except the quantity of acres.

This same patent was before this court in *Bledsoe* v. *Little*, 4 Howard, 13; and again in this same suit, 5 S. & M. 319; and in both cases sustained as a valid title. The patent is evidence that all preliminary steps have been taken to justify its issuance. It raises the presumption that the land was regularly surveyed and offered for sale, and regularly entered by the patentee. 4 Howard, R. 13. If it issued irregularly, it lies with the party who attacks it to show the irregularity.

The chief ground of objection is, that the description given in the patent has not, by proper proof, been shown to include fractional section 77, in township 7, range 3. As, by the public surveys, the ranges, townships, and sections are all numbered, a patent, conveying and describing a section by its number and the number of the township and range, is the best description that can be given, because it is the most certain. But, it is said, the description given in the patent should have been established by the survey made and returned according to law, with the field notes and the map made out by the surveyor-general, this being the only mode by which the existence of

such a section as that called for by the patent, could be proved. The original surveys and field book were not introduced. We do not think that such proof-was necessary. The law has intrusted to the surveyor-general the duty of making out the map from the returns made to him; when he has discharged that duty, we must suppose it was faithfully done according to law. From a copy of this map transmitted to the register and receiver, the public lands are sold, and the number given to the sections on these maps is the authentic lawful description. If we could require the field notes, we might be required to go further, and require the surveyor to be sworn. The maps are admitted in evidence as official acts. When this case was before us on the former occasion, the plaintiff failed, for want of a copy of the official map. We then held, that such a copy of the map was indispensably necessary, as the proper mode of proving the identity and description of the land conveyed by the patent. In the case of *Bledsoe* v. *Little,* a copy of the land office map was holden to be admissible in evidence, and a survey made under an order of court in conformity to it, was regarded as decisive of the identity of the land. It only remains to inquire whether such a copy as that referred to on the former trial has been introduced. A map, or diagram was introduced, with the certificate of the surveyor-general, that it was a true copy of part of the map of township 7, range 3 west, in the district west of Pearl river, which was approved by Thomas Freeman, surveyor south of Tennessee, and on record in his office, and that the courses and distances were truly copied from the original survey, also on file in his office. Thus, it seems, a map was made out and recorded in the surveyor-general's office. We must suppose this was the official map required by law. There is no proof that any other map was found in the office. Not only is it certified as a copy from the map on record, but the courses and distances on it were truly copied from the original survey, also on file. On this map, various sections or fractional sections are laid down, and, amongst others, section 77. It also shows a plat of the city of Natchez. The courses and distances of three of the lines of section 77 are also given. The lot in controversy lies within its boundaries,

and necessarily constitutes part of it, unless it can be shown to be excluded. The section is bounded all round by private claims, except on the north, and a small part of it on the west, which is bounded by the river. Its boundaries are thus fixed and certain, and its number identifies it beyond question. By that number it is known on the land office records. Its existence is fully established. It may be proper here to answer the objection, that this land never was surveyed. The certificate already noticed proves that it was. The land office map is at least *primâ facie* evidence of this fact; in addition to which, the surveyor-general certifies that the courses and distances are correctly copied from the " original survey." But we may remark further, that if less than 640 acres of public lands should be surrounded by private claims, the survey of them would be a survey of the public lands also. To re-survey it, would be to retrace the lines of the private claims. As, by the act of congress, a map was required to be made out and recorded, and as a copy of such a map has been introduced, with a certificate of its correctness by the surveyor-general, which certificate is made evidence by statute, we think the description given in the patent was legally proved, and the land granted sufficiently identified.

In the next place, it is insisted, that if such a section as 77 in township 7, range 3, existed, it was not subject to entry by Willis's heirs, or by Little, because it had been previously granted to the city of Natchez by act of congress. The act in question was passed on the 21st of April, 1806, and is a relinquishment from the United States in favor of the city of Natchez, " to all the land lying between the front street of the city of Natchez and the Mississippi river, and bounded on the north by North Fourth street and the land granted to Stephen Minor, and on the south by the lands annexed to the old Fort and those granted to William Barland;" on condition, that the land so relinquished should neither be cultivated nor occupied by buildings, but should be planted with trees and preserved as a common, for the use, comfort, and health of the inhabitants of the city, and other persons. Revised Code, 517, § 5. On the map already noticed, is a plat of the city of Natchez, between which and the Mississippi river is a vacant space, part of which is

numbered as section 76, which is divided from 77 by a line extended from the southern boundary of the city. When these two sections were so separated, we have no means of knowing; the presumption is, that this was done when the land was surveyed. Section 76 lies directly between the city and the river, and adjoins Front street from one end to the other. That this section was embraced by the act, there can be no doubt; but it is not by any means clear that 77 was. In the first place, no part of this section lies between Front street and the river. In the next place, it is not bounded on the north by North Fourth street, nor indeed is section 76, for the street was not extended across it. In the third place, the section in question is not bounded on the south by William Barland; and in the last place, it extends far below the city, in a direction which would seem to indicate that it could not have been useful to the city as a common, for it lies south of the city, and touches it only at the south-west corner. The declared purposes of this act, and the several reports made to congress, on which it was founded, induce the belief that the intention was to grant only the land lying in front of the city. No quantity of land was mentioned in the act; and when there is so much uncertainty in the description, we may very well look to the object and purposes of the donation. But what seems to be still more conclusive is, that the city never has pretended to claim any part of section 77, her claim being entirely confined to section 76. This fact is fully and clearly established. Now, we are to consider of the force of this disclaimer. The city was a corporation, and could only speak through its agents or officers. Dr. Tooley was president of the board of aldermen, and says the city never claimed the land in question. This is more a question of boundary than of title. A declaration by the owner of adjoining land, that his neighbor's land extends to a certain point, accompanied by acts of forbearance to go beyond that point, is evidence that the point designated is the boundary. *Stanley* v. *White*, 14 East, 332, 339, 341; *Inhabitants of West Cambridge* v. *Lexington*, 2 Pick. 536; *Church* v. *Burghardt*, 8 Ib. 327; 13 Wendell.

If an outstanding title were established in the city by documentary title, without dispute or doubt as to boundary,

the question might be different. But as the city claimed that part of the land lying in its front, which was evidently within the defined boundary, and did not claim any part of section 77 from the time of their grant in 1806 up to the trial of this suit in 1846, it is a circumstance almost, if not entirely, conclusive against an outstanding title in the city. A forfeiture of the condition of the grant was not urged, and it is left out of view. In the third place, it is objected that the deed from Mrs. Mc-Comas, who was a married woman at the time, (made jointly with her husband,) passed no title. To this it is answered, that the declaration contains a demise from Mrs. McComas, and one from Little; and if the title be in either, the case is made out; and this position is supported by authority. *Doe* v. *Dignowitty*, 4 S. & M. 73; Adams on Ejectment, 186, 187. This we take to be the very ground for laying two or more demises in the declaration. But, in addition to this, perhaps it would be going too far to say, that the deed from Mrs. McComas was absolutely void, as the statute seems to give sanction to conveyances made by married women under the requisite ceremonies. H. & H. Dig. 347. If this be not so, there is no mode by which they can convey their real estate, as the fine is not here in use. The case cited from 17 Johns. 167, is not precisely in point. The title set up by the wife was acquired from a third person, who had purchased the land under a judgment against her husband. Besides, the real estate which she joined in conveying belonged to her husband; she was only entitled to dower. Of course her subsequently acquired title was complete. It would not follow from the authority of this case, that Mrs. McComas would not be estopped by her deed.

The objection that this land was not subject to entry by Willis's heirs because of its being town lots, does not seem to be well founded. The case of *Chotard* v. *Pope*, 12 Wheat. 586, presented a different question. The town of Claiborne had been laid off under the authority of the government, which was an appropriation; and for this reason the Supreme Court held that it was not liable to entry. The act of December, 1820, excepted from entry by Willis's heirs all town lots reserved by the United States. Section 77 has not been reserved, or laid off into lots.

We have thus noticed the several grounds taken in argument in support of the position, that the patent and other title papers should have been excluded. We think the title of the plaintiff below must prevail, unless the plaintiff in error has shown a better title in himself or those under whom he claims.

A grant from the Spanish government to Rebecca McCabe, for a lot of ground, was introduced. This title seems to be complete, and if it embraced the land in controversy, would be conclusive on the rights of the parties; but this is probably not the case. The certificate of survey made by the surveyor of the Spanish government, bears date the 29th of June, 1795. The Spanish grant is dated the 2d of August, 1796. These title papers, accompanied by the surveyor's plat, were laid before the commissioners, who issued a certificate of confirmation to William Lintot, as assignee of Rebecca McCabe, on the 10th of February, 1807. This lot seems also to be properly laid down on the map in the surveyor-general's office. Of course it constitutes no part of section 77, but is numbered as a separate section.

But another title from the Spanish government to Rebecca McCabe was also introduced, and this, it is said, adjoins the land conveyed to her by the above-named grant, and covers the land in controversy. As it was contended that there was in reality but one grant to Rebecca McCabe, it becomes important to notice the dates and other points of difference. The only evidence of this last mentioned grant is the certificate of confirmation by the commissioners to John Walton, as assignee of Rebecca McCabe. From this certificate, it seems that this claim was founded on a Spanish order of survey, dated the 6th of May, 1795, for a lot of ground below the bluff in the city of Natchez. The application of Walton to the commissioners is accompanied by a plat of the land, which calls for the bluff on the east and the river on the west, and on the north is written the words "Mr. Lintot." The certificate of confirmation bears date the 2d of June, 1806. Judging from the dates, then, this seems to be the oldest claim. There were certainly two claims, one confirmed to Lintot and the other to Walton. They not only differ in dates, but the plats are materially different.

Rebecca McCabe, it seems, assigned this second claim introduced to Scanlan, and Scanlan to Smith, and Smith to Walton, who conveyed to Little and Brandt, and by intermediate conveyances it was ultimately conveyed to Sorias and Cozzens.

We find also in the record another certificate of confirmation in favor of Bernard Lintot, as assignee of Rebecca McCabe, which certificate also bears date on the 2d day of June, 1806. Accompanying this is Rebecca McCabe's petition to the Spanish governor, dated 2d May, 1795, and an order of survey dated the 6th of May. Judging from dates, we should suppose that this order of survey is the same that was assigned to Walton. If not, there were three titles conferred on Rebecca McCabe. In truth, however, there were probably only two. The certificates of confirmation constituted titles; and if the lot in question was embraced under either title, of course it was not subject to entry, and is not included in section 77. But whether it was so included in either of the confirmations, was a question for the jury; and it was distinctly and plainly submitted to them by the 6th instruction, given at the instance of the defendant, which is in the following words: "If the jury believe there were two lots confirmed by the board of commissioners, under different orders of survey, to Rebecca McCabe for different lots, and that said two lots are situated below Porter street, and that defendants are in possession of no land but the lot embraced in the order of survey confirmed to William Lintot, and the upper half of the lot confirmed to Bernard Lintot's heirs and Walton, then plaintiff shows no title to the land embraced in said two lots." The jury of course found that the lot in controversy was not embraced in either confirmation, and we cannot say their finding was wrong in this particular. There is great uncertainty in the description of the lot confirmed under the order of survey of the 6th of May, 1795. The title papers only prove that it lay below the bluff in the city of Natchez. The plat calls for hills on one end, and the river on the other; a description which may equally apply to all the land in the neighborhood. The name, "Mr. Lintot," written on the north side, may have been intended to indicate the ownership of adjoining land; but it does not fol-

Surget et al. *v.* Doe, ex dem. Little.

low that it was the land of William Lintot, acquired from Rebecca McCabe, the title to which did not originate until after the title to the lot confirmed to Walton and Bernard Lintot. How, therefore, can this call be understood as referring to William Lintot's confirmation? This would be to make a prior survey call for the line of a subsequent one. Nor is the parol proof at all certain as to the locality of the Bernard Lintot claim.

The charges asked by the defendant below are all given; and those asked and given for the plaintiff are substantially covered by the remarks already made.

Judgment affirmed.

Mr. Justice YERGER, at this term, delivered the following opinion of the court.

This case has been submitted to us upon a reargument. And after an attentive consideration of the questions presented, we have determined to adhere to the principles announced in the opinion of this court delivered by Chief Justice Sharkey at the January term, 1850. While adhering to the principles so laid down, our minds upon the whole record have been brought to a different result than was then expressed. This proceeds from the fact that, in our view, a portion of the instructions given by the court below, at the instance of the plaintiff, conflict with the rules of law, as laid down by the Chief Justice. It was held in the former opinion, that the Spanish grant to Rebecca McCabe, confirmed by the certificate of the Board of Commissioners to William Lintot, or assignee of Rebecca McCabe, on the 10th of February, 1807, conveyed a complete title to the land embraced in that grant. The court also held, that the certificates of confirmation by the board of commissioners constituted titles to the land; and if the land in controversy was embraced in either of the certificates of confirmation given in evidence for the defendant, that the plaintiff could not maintain his action. It appears from the evidence, that the board of commissioners, in addition to the certificate of confirmation to William Lintot, as assignee of Rebecca McCabe, made in February, 1807, confirmed, on the 2d of June,

1806, a title to John Walton to a tract of land as assignee of Rebecca McCabe, founded on her petition to the Spanish governor of 2d May, 1795, and a Spanish order of survey of the 6th May, 1795. The commissioners, on the 2d day of June, 1806, likewise confirmed to the legal representatives of Bernard Lintot, as assignee of Rebecca McCabe, a title to a tract of land founded on the same petition and order of survey of the 2d and 6th May, 1795. Upon examining the record and accompanying title papers laid before the commissioners, it will be seen that the seeming inconsistency of confirming the title of Walton and the heirs of Bernard Lintot on the same Spanish order of survey of May 6th, 1795, is removed by the fact, that Walton only claimed one half of the land embraced in the order of survey of that date, and the heirs of Bernard Lintot the other half; so that the order or certificate of confirmation was not of the whole land embraced in the order of survey to both, but a certificate of confirmation of equal moieties to each, — that being the portions claimed by them respectively as assignees of Rebecca McCabe. In this view of the case, and adhering to the opinion heretofore expressed, that these certificates of confirmation vested a title to the lands embraced in them, if the land in controversy is embraced either in the certificate of confirmation to William Lintot, as assignee of Rebecca McCabe, or in the certificate of confirmation to Walton, or to the legal representatives of Bernard Lintot, as assignees of Rebecca McCabe, then the plaintiff should not have had a verdict in his favor; and such was the opinion heretofore expressed by this court. In that opinion, however, it was stated, that this being a question of fact solely for the consideration of the jury, it was submitted to them by the 6th instruction, given at the instance of the defendant; and, as the jury found in favor of the plaintiffs, their verdict was conclusive on the point. We wish to change or modify the former opinion to this extent. While we do not doubt the correctness of the rule laid down on this point by Chief Justice Sharkey, yet in looking at the 9th, 10th, and 11th instructions, given at the instance of the plaintiff, it will be found that the circuit judge charged the jury, that the certificate of confirmation in

favor of William Lintot, as assignee of Rebecca McCabe, conferred no title to the land embraced therein; and that the certificates of confirmation in favor of Walton and the heirs of Bernard Lintot, as assignees of Rebecca McCabe, founded on the Spanish order of survey of May 6th, 1795, conveyed no title to the claimants under them, unless the jury were satisfied, from the evidence, that the land was surveyed by the direction of the surveyor-general, for the claimants, under that order of survey. These instructions are in conflict with the principles announced in the former opinion of this court, to wit, that "the certificates of confirmation constituted titles to the land embraced in them;" and, as these instructions were calculated to mislead the jury, we must, for that cause, reverse the case, and remand it for further proceedings, in accordance with the opinion heretofore delivered by Chief Justice Sharkey, as modified by this opinion.

Judgment reversed, and cause remanded.

NOTE, by Reporter.—This case was before the court at the January term, 1850, when the *first* opinion was delivered by Chief Justice Sharkey, affirming the judgment of the court below. A petition for reargument was presented by counsel for appellant, and granted at that term. At the present term of the court, the *second* opinion, upon reargument of the case, was delivered, reversing the decision of the circuit court. A petition for reargument was again filed by the counsel for appellee, at the present term, which was refused.