EDWARD HINES YELLOW PINE TRUSTEES *et al. v.* STATE
*ex rel.* MOORE, Land Com'r.

STATE *ex rel.* MOORE, Land Com'r, *v.* EDWARD HINES YEL-
LOW PINE TRUSTEES *et al.*

(In Banc. Oct. 1, 1923.)

[97 So. 552. Nos. 23309, 23390.]

1. PUBLIC LANDS. *State patent to public land highest evidence of
   title.*
   A patent to public land by the state is the highest evidence of
   title.

2.. PUBLIC LANDS. *State patent carries presumption that all legal
   prerequisites to its issuance have been complied with.*
   A patent to public land by the state carries with it the presump-
   tion that all the legal prerequisites necessary to its issuance
   have been complied with; that the officers charged with execut-
   ing such grants have performed their duties in regard to the
   several acts required to be done by them.

3. PUBLIC LANDS. *State patent cannot be questioned except for
   fraud or mistake.*
   A patent to public land issued by the state cannot be questioned
   either in a court of law or equity, except on the ground of fraud
   or mistake.

4. PUBLIC LANDS. *State patent to state functionary for public pur-
   poses to be liberally construed.*
   A patent of public land by the state to a functionary of the state,
   to be used for public purposes, is to be liberally and not nar-
   rowly construed.

5. PUBLIC LANDS. *Federal and state swamp land acts liberally con-
   strued to effect reclamation.*
   The Federal Swamp Land Act of September 28, 1850 (U. S. Comp.
   St. section 4958-4960), by which the swamp and overflowed
   lands in this state were granted to the state for the purpose of
   reclaiming such swamp and overflowed lands, as well as chapter
   34, Laws of 1852 (Pearl River Swamp Land Act), by which
   the state granted to the commissioners of the southern district
   of Pearl river the swamp and overflowed lands lying and
   situated on or near Pearl river and, included in said federal
   grant, for the purpose of reclaiming the swamp and overflowed
   lands on said river, have been liberally construed to that end

for a long period of years by the federal and state officials in-
trusted with the execution of said statutes, as well as by the
courts.

6. PUBLIC LANDS. *Acts of secretary of state in listing and patenting
swamp lands conclusive, except for fraud, accident, or mistake.*
Chapter 34, Laws of 1852, constituted the secretary of state a
special tribunal to determine what lands were embraced in the
grant by the state to the commissioners of the southern district
of Pearl river, of the swamp and overflowed lands in said dis-
trict lying and situated on or near Pearl river, and included
in the grant from the federal government to the state by the
act of September 28, 1850 (U. S. Comp. St. sections 4958-4960),
and his acts in selecting and listing said lands to said commis-
sioners and patenting same to the grantees of said commissioners
are conclusive as to the character and location of such lands and
as to whether they came within the terms of said act, except for
fraud, accident, or mistake in such selection, listing, and patent-
ing. And the fact that the secretary of state listed to said com-
missioners lands which were not in fact lying and situated on
or near Pearl river, and on certificates of sale by said commis-
sioners, issued patents to the grantees thereof, is no evidence
that such patents were procured as the result of fraud, accident,
or mistake.

7. PUBLIC LANDS. *Statute authorizing Attorney-General to cancel
fraudulent swamp land entries construed.*
Chapter 44, Laws of 1890, made it the duty of the Attorney-General
to institute the necessary legal proceedings "to cancel all en-
tries of swamp and overflowed lands which, in his opinion,
were made in violation of law and where the interest of innocent
purchasers under said fraudulent entries do not intervene to
prevent such cancellation." *Held:* If this statute did not go
to the extent of ratifying and confirming every patent thereto-
fore issued by the state to swamp and overflowed lands where
the rights of innocent purchasers had intervened, even though
such grants had been procured by fraud, accident, or mistake,
it did go to the extent of amounting to a declaration of the
legislative policy of this state to that effect.

8. PUBLIC LANDS. *Constitutional provision held not applicable to
certain named lands.*
Section 6, art. 8, of the Constitution of 1868, which appropriated
the proceeds of all lands then belonging to the state theretofore
granted by the United States known as swamp and overflowed
lands, except those lying and situated on Pearl river in the

counties of Hancock, Marion, Lawrence, Simpson, and Copiah, by its terms expressly excluded the lands here involved because they are lying and situated on or near Pearl river in the meaning of chapter 34, Laws of 1852.

9. CASES EXPLAINED AND DISTINGUISHED.
   *Tynes* v. *Southern Pine Co.*, 100 Miss. 129, 54 So. 885, explained and distinguished.

In Case No. 23,309:
    APPEAL from circuit court of Pearl River county.
    HON. G. WOOD MAGEE, Special Judge.

In Case No. 23,390:
    · APPEAL from chancery court of Pearl River county.
    HON. D. M. RUSSELL, Chancellor.

Separate actions by the state, on the relation of R. D. Moore, Land Commissioner, against the Edward Hines Yellow Pine Trustees and others. From a judgment on a directed verdict, defendants appeal, and from a decree dismissing the state's bill, it appeals. Reversed and dismissed as to the first case, and affirmed as to last case.

*J. W. Cassedy, Hathorn & Williams, Rawls & Hathorn,* for appellant. In Case No. 23390 and for appellees in Case No. 23309.

First. Neither the board of commissioners of the Southern District of Pearl river nor the secretary of state nor the governor were given any power or authority, by the legislative act of 1852, to deal with, to sell, or to dispose of the lands involved in this suit.

In discussing this contention of appellant, it is necessary to bring under review and to construe the legislative act of 1852, in order to determine whether the lands involved in this suit were embraced within the purview

of that act. In construing the act, it is well to keep in mind those fundamental rules of construction which guide courts to a proper construction of statutes. In 36 Cyc. 1106, this rule of construction is given: "The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the legislature. This intention, however, must be the intention expressed by the statute, and where the meaning of the language used is plain, it must be given effect by the court, or they would be assuming legislative authority." .

Again in 36 Cyc., 1114, this further rule is stated: "In the interpretation of statutes, words in common use are to be construed in their natural, plain and ordinary signification. It is a well-settled rule that so long as the language used is unambiguous, a departure from its natural meaning is not justified by any consideration of its consequences, or by public policy; and it is the plain duty of the court to give it force and effect."

The title of the act of March 12, 1852, recites that it is to provide for the appropriation of the "swamp and overflowed lands on the Pearl river."

The words used in the legislative act to describe the lands dealt with are: "the swamp and overflowed lands lying and situated on Pearl river."

There are three conjoint elements which go to make up a description of the lands dealt with and covered by this legislative act. These three conjoint elements of description are (a) that the lands must be swamp lands donated to the state under the act of Congress approved September 28, 1850; and (b) that such lands must be within the five counties named in the act of March 12, 1852; and (c) that they must be such of said lands within said five counties as are situated on Pearl river. It is just as essential that the lands shall be on Pearl river as it is that they shall be within the counties named in the act. To hold that the lands involved in this suit, located on Wolf river and a tributary of Pascagoula river, twenty

133 Miss.—22

miles and more from Pearl river, unaffected by the waters of that river, and near the eastern boundary line of the county, were dealt with and covered by said legislative act, would be to ignore this important and essential conjoint element of description used in the act to describe the lands and would be, in effect, to construe the act as dealing with and covering all the lands within the county, and not simply with those lands therein "lying and situated on Pearl river."

Even if section 2 of the act of March 12, 1852 had described the lands as being all those swamp lands "on or near Pearl river" within the five counties named in the act, instead of describing them as being those swamp lands therein "lying and situated on Pearl river," and if these words are to be construed in their natural, plain and ordinary signification, as courts uniformly construe such words when used in statutes, then even these words would not embrace the lands involved in this suit, situated, as they are, outside of 'the Pearl river water-shed, twenty miles and more from Pearl river, within a few miles of the eastern boundary line of the county, and actually located on Wolf river and on Pascagoula river.

Second.    The lands involved in this suit were, by the express terms of the Constitution of 1868, set aside and appropriated for the support of free schools within the state.

The state of Mississippi having provided by the act of March 12, 1852, for the disposal of those swamp lands, and only those swamp lands, "lying and situated on Pearl river" within the five counties named in said act; the Constitution of 1868 provided for the disposal of all the remaining swamp lands in said five counties, including the lands involved in this suit, in the following manner: "Section 6.    There shall be established a common school fund which shall consist of the proceeds of the lands now belonging to the state, heretofore granted by the United States, and of the lands known as 'swamp lands,' except

the swamp lands lying and situated on Pearl river in the counties of Hancock, Marion, Lawrence, Simpson and Copiah, and of all lands now ·or hereafter vested in the state by escheat or purchase, or forfeiture for taxes  .  .  . which funds shall be securely invested in United States bonds, and remain a perpetual fund, which may be increased but not diminished, the interest of which shall be inviolably appropriated for the support of free schools."

It is perfectly clear that the framers of the Constitution had before them and construed the act of March 12, 1852. It is equally clear that they construed the said act not to embrace all the swamp lands in the five counties named; but only to embrace those swamp lands therein "lying and situated on Pearl river."

The Constitution of 1868 not only construed the act of March 12, 1852, to embrace only those swamp lands "lying and situated on Pearl river" in the five counties named in the act, but it actually set apart and reserved for the support of schools all swamp lands in said counties except those on Pearl river.

The first and the only time that the act of March 12, 1852, has ever been passed upon by the supreme court of Mississippi is in the case of *Tynes* v. *Southern Pine Company,* 54 So. 885. In this Tynes case, the court was dealing with chapter 169 of the Laws of 1871 creating the Pearl River· Improvement and Navigation Co.; however, this act was merely and simply and only an amendment to the act of March 12, 1852.

In this Tynes case a patent was issued to the Improvement Company, under the authority of chapter 169 of the Laws of 1871, for lands located in section 30, township 1 North, Range 13 East, in Marion county, about ten miles west of Pearl river and about six miles east of the western boundary line of Marion county, and said lands were not affected by the waters of Pearl river. The appellant in that case claimed that the lands there involved had not been set aside for school purposes by section 6 of article 8 of the Constitution of 1868; but that the same were

within the exception contemplated by that section of the Constitution. This contention was disposed of by the supreme court, speaking through Chief Justice Mayes, in the following language:

"There is no merit in the contention of appellant, and the decree of the court below, sustaining the demurrer and dismissing the bill is correct.

"In view of section 6, article 8 of the Constitution of Mississippi of 1868, which provides that there shall be established a common school fund, which shall consist of the proceeds of the lands now belonging to the state, heretofore granted by the United States, and of the land known as 'swamp lands,' except the swamp lands lying and situated on Pearl river, in the counties of Hancock, Marion, Lawrence, Simpson and Copiah, etc. . . . the act of 1871 could not authorize the issuance of patents to the Pearl River Navigation Company of the land which is in controversy in this suit. The bill itself shows that the lands are on Pearl river, and the language of the bill is even broader than this, in that the bill expressly states that the land is neither 'on or near Pearl river.' No act passed by the legislature in view of the article of the Constitution above referred to, could donate to anybody for any purpose lands situated as was this land."

Third. Since the act of March 12, 1852, did not authorize the officers of the state to deal with or dispose of the lands involved, in this suit, and since the Constitution of 1868 set these lands apart for school purposes, the certificates of purchase and patents issued in 1871 and 1881 were issued without authority of law and in violation of the Constitution, and, therefore, are null and void and did not divest the state of title to the lands.

We think it may be laid down as law without exception that a grant of state lands can only be effected by and through an act of the legislature, and in accordance with its very terms. The grant of March 12, 1852, was a legislative grant, and by its very terms it limited the lands granted to those "lying and situated on Pearl river" in

the five counties named in the act; and all other lands within said counties were specifically set apart and appropriated for school purposes by the Constitution of 1868. Since by the very terms of this legislative grant the lands were restricted and limited to those lands "lying and situated on Pearl river" in the five counties named, and since the Constitution of 1868 expressly set apart and appropriated for school purposes all other lands within said counties, it follows that the land department of the state was without power, under the act of March 12, 1852, either to enlarge the terms of this legislative grant or to encroach upon this constitutional reservation. This is a well settled principle of law, and the rule is stated in 32 Cyc., pp. 933, par. 3, as follows:

"Whether lands are within the limits or subject to the operation of a grant for internal improvements is not a question of fact within the rule which makes the consideration and judgment of the land department upon questions of fact final. And the land department cannot enlarge the limits of a grant of land by Congress, but its acts in issuing patents thereunder for lands lying outside the boundary fixed by the grant itself is without validity to convey title, and the patents will be cancelled at the suit of the government."

In the case of *Burfenning* v. *Chicago, St. P., M. and O. Ry. Co.,* 163 U. S. 321, 41 L. Ed. 175, it is said: "But it is also equally true that when, by act of Congress, a tract of land has been reserved from homestead and preemption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or such dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot over-ride the expressed will of Congress, or convey away public lands in disregard or defiance thereof. *Smelting Company* v. *Kemp,* 104 U. S. 636; *Wright* v. *Roseberry,* 121 U. S. 488, 7 Sup. Ct. 985; *Doolan* v. *Carr,* 125 U. S. 618, 8 Sup. Ct. 1228; *Davis' Adm'r.* v. *Weibbold,* 139 U. S.

507 ; *Knight* v. *Land Ass'n.*, 142 U. S. 161, 12 Sup. Ct. 258."

In *Smelting Company* v. *Kemp,* 104 U. S. 636, it is said : "A patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale or dedicated to special purposes, or had been previously transferred to others."

In *Smelting Company* v. *Steel,* 106 U. S. 447, it is said : "It need hardly be said that we are here speaking of a patent issued in a case where the land department had jurisdiction to act, the lands forming part of the public domain, and the law having provided for their sale. If they never were the property of the United States, or if no legislation authorized their sale, or if they had been previously disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action."

In the case of *Doolan* v. *Carr,* 125 U. S. 625, it is held that even in actions at law the validity of a patent, though in due form, is subject at all times to the inquiry whether the officers of the government who issued it—"Had the lawful authority to make a conveyance of the title. But if those officers acted without authority, if the land which they purported to convey had never been within their control, or had been withdrawn from their control at the time they undertook to exercise such authority, then their act was void—void for want of power in them to act on the subject-matter of the patent, not merely voidable . . . It is, nevertheless, a clear distinction, established by law, and it has been often asserted in this court, that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue."

In· *U. S.* v. *Coos Bay Wagon R. Co.*, 89 Fed. 151, it is said: "The conclusiveness of the judgment of the land department as to the right of the road company to lands under the grant is limited to lands that are subject to the grant .\ . . Lands without the limits of the grant are not subject to the grant, and the adjudication of the land department to the contrary is no more conclusive than it would be if the lands were expressly reserved from the grant. If it is the will of Congress that the lands shall not be granted, the action of the land department cannot extend the grant over them. Whether lands are within the limits of the grant is not a question· of fact, within the rule which makes the consideration and judgment of the land department upon questions of fact final. Such question is determined by the records of the department, precisely as the lines of the public .surveys are proved. The grant in this case is of the odd-numbered sections, to the extent of three sections in width, on each side of the road, and an additional amount equal to the amount reserved or otherwise appropriated, not exceeding six miles on either side of the road. The utmost limit of the grant is therefore six miles on either side of the road. The action of the land department cannot enlarge the grant or extend its boundaries, as it may do if the limits of the grant which are capable of exact location from 'the plats and maps in the land office are made to depend upon parol testimony."

We think the case of *Clements* v. *Anderson*, 46 Miss. 581, is a valuable authority in this connection and is particularly in point on the case at bar.

In this case of *Clements* v. *Anderson, supra,* one Green had purchased scrip under the act of March 15, 1852, and and located land under this scrip which was not within one of the counties named in the ·act of March 15, 1852, but was located in Attala county, one of the counties embraced in the district created by the ·act of March 16th, 1852, and the secretary of state had issued to Green a patent on said scrip for the land in Attala county, and

by mesne conveyances Green's claim of title became vested in Anderson. The patent was issued to Green in 1853. Afterwards, in 1869, Clements located Attala county scrip issued under the act of March 16, 1852, on this same land and received a patent for it. Clements, the junior patentee, filed the suit in ejectment against Anderson, the grantee of Green, and in passing upon these two patents the supreme court said: "The laws of the 15th and 16th of of March, 1852, under which these grants were made, were construed in the case of *Jackson* v. *Dilworth,* 39 Miss. 773. The act of the 15th of March, under which Green made his location, was held to confine the purchasers of the scrip to a location upon lands in the counties therein designated. In effect the act granted six hundred thousand acres, in the counties bordering on the Mississippi river, for the purpose of constructing a levee; the scrip for which in appropriate sub-divisions should be sold, and located by the purchaser, or his assigns, upon lands granted to the counties. It was further held, that the act of the 16th of March appropriated the swamp lands embraced in the district therein described, and which includes the county of Attala, to the respective counties in which the lands are situated; that thereby the counties acquired a vested right which could not be withdrawn, without their consent; and that, although such consent might be given, it could not impair the right of the holder of scrip previously purchased. It followed, therefore, from these premises, and was so announced that the holder of scrip, issued by one of the counties in the Creek district, had no warrant to locate in a county included in the district, as defined in the act of 16th of March, and that, although such location might be approved by the secretary of state, and consummated by a patent, the patent was illegal and invalid, and conferred no title; but that the land was still open to be taken up by scrip issued by the authorities of the county in which the land was situated."

Upon the point that a patent is void and inoperative to pass title to the land described therein, where there is no authority in the officer of the state issuing the patent to dispose of the land, we cite the following Mississippi cases: *Eastman Gardner Co.* v. *Barnes,* 95 Miss. 715; *Hoskins* v. *R. R. Co.,* 78 Miss. 771, 29 So. 518; *Penick* v. *Floyd Willis Cotton Co.,* 81 So. 510; *Dees* v. *Kingman,* 80 So. 528; *Howell* v. *Miller,* 88 Miss. 655; *Edwards* v. *Butler et al.,* 89 Miss. 179; *Shelton* v. *Thompson,* 53 So. 538; *Clements* v. *Anderson,* 46 Miss. 581; *Green* v. *State,* 56 Miss. 771; *Tynes* v. *Southern Pine Co.,* 54 So. 885; *Cohn* v. *Lumber Co.,* 80 Miss. 659; *Hardy* v. *Hartman,* 65 Miss. 509; *Becker* v. *Columbia Bank,* 112 Miss. 819; *McLemore* v. *Anderson,* 43 So. 878; *Burroughs Land Co.* v. *Murphy,* 95 So. 514.

We have shown that the lands involved in this suit did not come within the terms of the act of March 12, 1852; we have also shown that these lands were set aside and appropriated for school purposes by the Constitution of 1868; and we have shown that for these reasons, the patents issued by the secretary of state to Bonner and Seal and to Bradford and Seal were unauthorized and void. It follows, therefore, that the patentees had no title to convey, and that the claim of title now being asserted by appellees is void, for, as said by this court in the case of *Burroughs Land Company* v. *Murphy, supra*: "The deed from S. Gwin, auditor, which was objected to when offered in evidence does not contain the essential endorsements required by this section to give it validity, and, since this deed was void, the appellant had no title to convey at the time it executed its warranty of title."

Fourth. Appellees' Contention No. I. The contention of appellees that the lands involved in this suit were in fact embraced within the terms of the act of March 12, 1852, has been fully answered and disposed of, we think, by our argument made under Appellant's Contention No. 1. We will not attempt to add here anything to the argument made there.

Fifth. Appellees' Contention No. II. We have stated appellees' contention No. II to be—"That, since the legislative act of 1852 authorized the secretary of state to furnish the board of commissioners with a list of the lands lying and situated on Pearl river, it also authorized him to list the lands involved in this suit although said lands do not in fact lie on Pearl river but lie on Wolf river and on Pascagoula river; and that because patents were issued for these Wolf river and Pascagoula river lands under the assumed authority of this legislative act, the court must presume that the secretary of state did in fact include these lands in his list to the board of commissioners; and also that his act in making such list so presumed to have included these Wolf river and Pascagoula river lands divested the state of its title thereto and vested title and authority to sell the same in said board of commissioners, thereby authorizing them to issue certificates of purchase and the secretary of state and governor to issue patents binding on the state."

Boiled down to its essence, this contention of appellees may be said to rest solely upon the postulate that: Because patents were issued for these lands in 1871 under the assumed authority of the act of March 12, 1852, the court must presume that the secretary of state embraced these lands in his list furnished to the board of commissioners under that act; and that, if he did embrace these Wolf river and Pascagoula river lands in his list, title passed to the lands under the patents, notwithstanding said lands were not "Lying and situated on Pearl river" and are not lands coming within the terms of the grant of 1852.

For the convenience of the court, and for our own convenience, we will divide and discuss this contention of appellees under the following two sub-heads:

(A) The issuance of the patents raises no presumption that the secretary of state included these lands in his list to the board of commissioners.

(B)   The act of March 12, 1852, did not vest in the secretary of state the discretion to embrace in his list to the board of commissioners lands on Wolf river and on Pascagoula river as being lands on Pearl river.

(A)   No presumption attending patents.   The contention of appellees that the court will presume the secretary of state included the lands involved in this suit in his list to the board of commissioners, simply because the patents were issued, is based upon the theory that he was given authority by the act of March 12, 1852, to deal with these Wolf river and Pascagoula river lands.

Where, as in the case at bar, there was no authority in the secretary of state to deal with the subject-matter of this litigation, the objection to the patent reaches beyond the act of the secretary of state in listing these lands and goes to the question of whether or not he had power to deal with the lands. And when it appears, as in this case, that he had no authority to deal with the lands which constitute the subject-matter of this litigation, no presumption that he listed such lands will attend the issuance of the patents.

Upon the authority of the cases last above cited, we submit that there can be no doubt but that appellees' contention that the issuance of the patents raises the presumption that the secretary of state furnished a list embracing the lands involved in this suit, is fundamentally unsound and utterly untenable.

This is the very presumption that is never indulged. No better statement of the rule can be found than the following taken from the case of *Rowan* v. *Lamb* (Iowa), 4 Green. 468: "Presumptions are allowed where the facts to be presumed are consistent with the duty, trust, or power authorized, and tend to subserve the purposes of justice; but when the act would be unauthorized by the trust or office or is contrary to the duty of the party assuming the power, no such presumption can be admitted."

Again, as stated in *Houston* v. *Terry*, 3 Tex. 390; "The

acts of an officer having competent authority may be presumed to be in conformity with the law, and as affording proof of the fact on which such action was founded; but, when done in the exercise of usurped powers, they are not only null, but raise no presumption."

Again, it is said in *Jones* v. *Muisbach,* 26 Tex. 235: "The presumption that an officer has acted within the limit of his power can never be invoked to sustain the acts of an officer outside of, or contrary to, the usual and well recognized functions and duties of his office."

Again, it is said in *Lauve* v. *Wilson* (La.), 38 So. 522: "It is true that under the acts of Congress of May 20, 1826, chapter 83, 4 Stat. 179, and of the General Assembly of this state (act no. 316, p. 401, of 1855; Rev. St. 2951), a method was provided by which other lands might have been selected to supply the deficiency in particular townships resulting from the fact that fractional sections had not passed under the general grant of sixteenth sections for the use of schools. It is also true that there is a general presumption that public officers perform their official duty, and, when some pre-existing fact is necessary to the validity of an official act, the presumption in favor of the official act is presumptive proof of such preceding act, or' pre-existing fact. Upon the other hand, the presumption that an officer has done his duty cannot sustain his action where the mandatory requirements of the law concerning the record of such action are disregarded. 22 Am. and Eng. Ency. of Law (2 Ed.), pp. 1267, 1268, 1270. And in any event such presumption merely furnishes a species of evidence that may be rebutted by proof. Applying these propositions to the instant case, if the land here in question had been selected to supply the deficiency of school lands in the fractional township, a record should have been made of that fact; but not only is there an absence of proof of such record, but it is affirmatively shown that none exists."

(B) No discretion in secretary of state. We may con-

cede, for the sake of argument, that the secretary of state included the lands involved in this suit in the list he furnished the board of commissioners; and yet, even if he had done this, his act would not bind or conclude the state from now inquiring into the validity of the patent. The duties of the secretary of state in making up and furnishing the list to the board of commissioners was purely ministerial, and he had no discretion as to the lands to be included in his list.

There can be no question, we think, but that the lands involved in this suit were not embraced within the terms of the grant to the board of commissioners.

There can be no question either but that the act of March 12, 1852, within itself described the lands granted and fixed the limits of the grant.

The case at bar is clearly distinguishable from the line of authorities which hold that selections of land by the secretary of interior, under the Swamp Land Acts, as being swamp lands, whether or not the same are such in fact, is not reviewable by the court.

Sixth. Appellees' Contention No. III. Appellees contend that if they are in error in their contention No. I and their contention No. II, then the state of Mississippi, by legislative enactments since the issuance of the patents, has ratified the unauthorized acts of the board of commissioners, secretary of state and governor in their attempts to convey the lands.

The only acts of the legislature of the state of Mississippi which could be claimed, even by implication, to ratify these void patents are chapter 3, Laws of 1873 and chapters 15 and 16, Laws of 1877. The rule on ratification of unauthorized contracts made by officers of the state is given in 22 R. C. L., page 460, par. 122, as follows: "An act of ratification, to be effective, must be direct, explicit, unequivocal, and with full knowledge of the facts."

Seventh. Appellees' Contention No. IV. Appellees contend that if they are in error in their contention No. I and

their contention No. II, and their contention No. III, then the state of Mississippi is estopped from now asserting her title to the lands.

This contention of appellees will be discussed, in the order named, under the following three sub-heads: (A) equitable estoppel does not apply to the state in any case; (B) estoppel when state acts in private and proprietary capacity; (C) state not required to offer to return purchase money and taxes. (A) Equitable estoppel does not apply to state. As announcing the rule that the state is not bound nor estopped from asserting her rights to her own property, unless it be done in her sovereign capacity by legislative enactment or resolution, we cite and quote from the following authority, first, from the case of *Georgia* v. *Paxon and Cannon,* 46 S. E. 872: "As a question of law, the state is not bound nor estopped from asserting her rights to her own property, unless it be done in her sovereign capacity by legislative enactment or resolution."

And lastly from our own supreme court in the case of *Robertson* v. *H. Weston Lumber Company,* 87 So. 120: "The doctrine of estoppel is not asserted against the state in all cases where an individual might be estopped, because an individual is competent to make agreements and such agreements may be valid when made by an individual when a state or its officers might not have power to make it, and if they had no power under the law to make the agreement, the state would not be bound by the unauthorized act of the agent in exceeding his authority."

There is no better settled principle of law in the jurisprudence of any land than this principle; that the government is never estopped by the unauthorized acts, neglect, laches, or acquiescence of her officers.

The doctrine has been so often discussed before the courts, in so many phases and from so many angles, and has so universally been held not to apply to the government, that we shall content ourselves to cite and quote from only a few of the leading cases.

In *Miller* v. *Dunn,* 72 Cal. 462, 14 Pac. 27, it was said: "The government is never estopped as a private individual or corporation may be, on the ground that the agent is acting under an apparent authority which is not real; the conclusive presumption that his powers are known rendering such a consequence impossible.   So that the government is bound only when there is actual authorization.   Bish. Const. Par., 993."

In the case of *Josselyn* v. *Stone,* 28 Miss. 753, the supreme court of Mississippi sets out the rule and gives the reason for the rule that laches does not apply to the state, and this reason is the same as that which prevents estoppel from applying to the state.   The rule and the reason for the rule are given as follows:   "It is a universally recognized rule that no laches is to be imputed to the state and against her; that no time runs so  as to bar her rights.   This is a great principle of public policy, intended to secure the rights and property of the public against loss or injury by the negligence of public officers and agents."

(B)   Estoppel when government acts in private and proprietary capacity.   There is another line of cases which speak of the prosecution by the government of a "private and proprietary, instead of a public or government right," in which cases it is asserted that the government is not entitled to any of these exemptions of *nullum tempus,* from laches and from equitable estoppel.   This line of cases has confused counsel for appellees.   This confusion seems to arise out of a misconception of what was meant in the case of *La Republique* v. *Saratoga Vichy Springs Co.* (U. S.), 48 L. Ed. 253, cited by counsel for appellees, when the court said:   "In such cases either where the government is suing for the use and benefit of an individual, or for the prosecution of a private and proprietary, instead of a public or governmental right, it is clear that it is not entitled to the exemption of *nullum tempus,* and that the ordinary rule of laches applies in full force."

It is only necessary to read this case in connection with the case of *United States* v. *American Bell Telephone Company* (U. S.), 42 L. Ed. 144, in order to appreciate the sense in which the term "private and proprietary" is used in this Vichy Springs case, and to understand why it was held in that case that there was no exemption from laches.

(C)    State not required to offer to return purchase money and taxes. It is contended that the state should offer to do equity by offering to return the money received for the sale of these lands, and by returning the taxes collected on said lands. As to offering to return the money received for the sale of said lands, it is enough to say that the money paid, if paid at all, for the sale of these lands was paid to the treasurer of the board of commissioners of the southern district of Pearl river and was never received by the state. As to offering to return the taxes paid by appellees and their predecessors in claim of title to these state lands, the manner in which taxes erroneously paid on state lands are to be returned by section 4347 of the Mississippi Code of 1906, Hemingway's Code, par. 6981. The same contention that is being made here was made in the case of *Causey* v. *United States,* 240 U. S. 399, and was disposed of by the supreme court of the United States in the following language: "The further objection is made that the bill cannot be maintained because it does not contain an offer to return the scrip received when the commuted entry was made. The objection assumes that the suit is upon the same plane as if brought by an individual vendor to annul a sale of land fraudulently induced. But, as this court has said, the government, in disposing of the public lands, does not assume the attitude of a mere seller of real estate at its market value. These lands are held in trust for all the people, and in providing for their disposal Congress has sought to advance the interests of the whole country by opening them to entry in comparatively small tracts under restriction designed to accomplish their settlement, de-

velopment and utilization. And when a suit is brought
to annul a patent obtained in violation of these restric-
tions, the purpose is not merely to regain the title but also
to enforce a public statute and maintain the policy under-
lying it. Such a suit is not within the reason of the or-
dinary rule that a vendor suing to annul a sale fraudu-
lently induced must offer and be ready to return the con-
sideration received. That rule, if applied, would tend to
frustrate the policy of the public land laws; and so it is
held that the wrong-doer must restore the title unlawfully
obtained and abide the judgment of Congress as to wheth-
er the consideration paid shall be refunded."

See to the same effect *Clements* v. *Anderson,* 46 Miss.
581, holding: "But it is further objected that, inasmuch
as the state accepted Green's money, it is estopped from
denying his title and making a subsequent grant. It may
be responded that the lands of which the *locus in quo* is
part, were created a fund for certain purposes, to be ad-
ministered by the counties by a sale of the scrip and use
of the money for certain purposes. The money never went
into the treasury for ordinary state purposes, nor was it
subject to the appropriation or control of the state. More-
over, this point was necessarily involved in *Jackson* v.
*Dilworth,* (39 Miss. 773) and is concluded by the judg-
ment in that case. There, the patentee had paid his money
to the commissioners of Tunica county, for the scrip, and
had made a location in Attala, for which a patent eminat-
ed, yet his patent was declared void."

Eighth. Appellees' Contention No. V. Appellees con-
tend that the state has no right to maintain this suit be-
cause, they say, title to the lands involved in the suit
was vested in Marion county by virtue of an act of the
legislature approved March 16, 1852, chapter 14 of the
Laws of 1852.

A mere glance at this act of the legislature will con-
vince the court that no lands lying south of the thirty-
first parallel were affected by it. The act does not grant

133 Miss.—23

"all the swamp and overflowed lands on all the rivers and streams east of the Louisiana line," as counsel for appellees state; but it grants "all the swamp and overflowed lands on all the rivers and streams east of the western base of the hills bordering on the Mississippi bottom, from the Louisiana line to a point opposite the mouth of the Yazoo River," etc.

We think the fact that the lands involved in this suit are south of the thirty-first parallel completely disposes of this contention of appellees. However, since they have urged the point, we will discuss the question at some length in order to demonstrate to the court, upon authority from this court, that even if the lands involved in this suit had been affected by the act of March 16, 1852, this contention of appellees would still be unsound in the light of the authority we shall cite and quote from.

The title to the swamp and overflowed lands dealt with by the act of March 16, 1852, did not pass to the county. There has been but one decision by our supreme court on the question of whether or not title to the lands embraced within the terms of the act of March 16, 1852 passed to the counties therein named. We refer to the case of *Clements* v. *Anderson,* 46 Miss, 588.

An examination of the acts of the legislature since 1852, dealing with the swamp and overflowed lands, will convince the court of the correctness of the decision in the case of *Clements* v. *Anderson.*

The case of *Clements* v. *Anderson, supra,* followed the decision of the court in the case of *Jackson* v. *Dilworth,* holding, as we have already pointed out, that the vested interests acquired by the counties, after the scrip had been issued, was to the funds to be derived from the sale of the lands and that the title to said lands remained in the state.

Conclusion. In conclusion, we desire to call the court's attention to the fact that the Constitution of 1890, section 95, provides that the lands belonging to, or under the

control of, the state shall never be donated, directly or indirectly, to private corporations, or individuals, or railroads.

To the best of our ability, we have undertaken to demonstrate to the court that the lands involved in this suit were not granted to the board of commissioners of the southern district of Pearl river, and that said board, through its treasurer, and the secretary of state, and the governor, had no power or authority under this act to convey the state's title to said lands.

*T. J. Wills, Davis & Wallace* and *H. Cassedy Holden,* for appellees, in Case No. 23390, for the appellants, in No. 23309.

I.   The patents here relied upon are valid and should be upheld.   A patent is the highest evidence of title and with it passs all control of the executive department of the government over the title.   It is impeachable only for fraud or mistake; and in courts of law it is evidence of the true performance of every prerequisite to its issuance, including payment of the consideration.   The law presumes that a grant of the public domain by a public and responsible officer claiming the right of disposition, is authorized by the government which he represents, and that it passes the legal title.   *United States* v. *Stone,* 2 Wall. 525, 17 U. S. (L. Ed.) 765; *Irvine* v. *Irvine,* 9 Wall. 617, 19 U. S. (L. Ed.) 800; *Wright* v. *Roseberry,* 121 U. S. 488, 7 S. Ct. 985, 30 U. S. (L. Ed.) 1039; *Omaha, etc., Smelting, etc., Co.* v. *Tabor,* 13 Colo. 41, 21 Pac. 925, 16 A. S. R. 185, 5 L. R. A. 236.   *Carter* v. *Spencer,* 4 How. (Miss.) 42, 34 Am. Dec. 106; *Witherinton* v. *McDonald,* 1 Hen. & M. (Va.) 306, 3 Am. Dec. 603; *Moore* v. *Robbins,* 96 U. S. 530, 24 U. S. (L. Ed.) 848; *Bouldin* v. *Massie,* 7 Wheat 122, 5 U. S. (L. Ed.) 414; *Patterson* v. *Jenks,* 2 Pet. 216, 7 U. S. (L. Ed.) 402; *Stringer* v. *Young,* 3 Pat. 320, 7 U. S. (L. Ed.) 693; *Crews* v. *Burcham,* 1 Black

352, 17 U. S. (L. Ed.) 91; *Armstrong* v. *Morrill,* 14 Wall. 120, 20 U. S. (L. Ed.) 765; *Best* v. *Polk,* 18 Wall. 112, 21 U. S. (L. Ed.) 805; *Dominquez De Guyer* v. *Banning,* 167 U. S. 723, 17 St. Ct. 937, 42 U. S. (L. Ed.) 340; *Hooper* v. *Young,* 140 Cal. 274, 74 Pac. 140, 98 A. S. R. 56; *Omaha, etc., Smelting, etc., Co.* v. *Tabor,* 13 Colo. 41, 21 Pac. 925, 16 A. S. R. 185, 5 L. R. A. 236; *Johnson* v. *Drew,* 34 Fla. 130, 15 So. 780, 43 A. S. R. 172; *Dodson* v. *Cocke,* 1 Overt. (Tenn.) 314, 3 Am. Dec. 757; *Schnee* v. *Schnee,* 23 Wis. 377, 99 Am. Dec. 183; *Patterson* v. *Jenks,* 2 Pet. 215, 7 U. S. (L. Ed.) 402; *Lea* v. *Polk County Copper Co.,* 21 How. 493, 16 U. S. (L. Ed.) 203; *Armstrong* v. *Morrill,* 14 Wall. 120, 20 U. S. (L. Ed.) 765; *Mobile* v. *Eslava,* 9 Port. (Ala.) 577, 33 Am. Dec. 325; *Jackson* v. *Astor,* 1 Pin. (Wis.) 137, 39 Am. Dec. 281; *Parkinson* v. *Bracken,* 1 Pin. (Wis.) 174, 39 Am. Dec. 296; *Hooper* v. *Young,* 140 Cal. 274, 74 Pac. 140, 98 A. S. R. 56. See infra, par. 36, as to the effect of patent. 22 R. C. L., pages 271 to 272.

A patent granted by the state is a completion of the legal title, and the rule is that it take effect from its date and not from the time of its delivery. To constitute a grant from the state no particular terms are necessary. It is a legal presumption that the officers charged with the executing of land grants have performed their duty in regard to the several acts to be done by them. When the seal of the state appears together with the signatures of the governor and secretary of state on the instrument, it is presumed to be genuine. *Green* v. *Liter,* 8 Cranch 229, 3 U. S. (L. Ed.) 545; *Ex parte Kuhtman,* 3 Rich. Eq. (S. C.) 257, 55 Am. Dec. 642; *Enfield* v. *Permit,* 5 N. H. 280, 20 Am. Dec. 580; *Lamm* v. *Chicago, etc., R. Co.,* 45 Minn. 71, 47 N. W. 455, 10 L. R. A. 268; *Richards* v. *W. M. Ritter Lumber Co.,* 158 N. C. 54, 73 S. E. 485, 74 S. E. 1016, Ann. Cas. 1913 D 313; *Cofield* v. *McClelland,* 16 Wall. 331, 21 U. S. (L. Ed.) 339; *Richards* v. *W. M. Ritter Lumber Company,* 158 N. C. 54, 73 S. E. 1016, Ann. Cas. 1913 D. 313; 22 R. C. L., page 340.

The patent to public lands is conclusive in a court of law unless void on its face. *Clements* v. *Anderson,* 46 Miss. 581.

In *Sweat* v. *Corcoran,* 37 Miss. 516, this court said: "And it is settled in this court that a patent for land emanating from the government of the United States is the highest evidence of title; and in a court of law is evidence of the due performance of every prerequisite to its issuance, and cannot be questioned either in a court of law or equity, except upon the ground of fraud or mistake." *Bledsoe* v. *Little,* 4 How. Miss. Rep. 13; *Carter* v. *Spencer,* Id. 42; 24 Miss. Rep. 118; *Harris* v. *McKissack,* 34 Id., 464.

"As the patent in this case was not assailed upon the ground of either fraud or mistake, it results from these principles, that it was not only the highest, but that it was conclusive evidence of title in the defendant in error, upon which a recovery could be had in this action."

A patent for land from the United States government is evidence that all the legal prerequisites necessary to its issuance have been complied with, and if any irregularity in its issuance be alleged, it must be shown. *Bledsoe* v. *Little,* 4 H. 13; *Carter* v. *Spencer,* 4 H. 42; *Hurgett* v. *Little,* 24 Miss. 118; *Harris* v. *McKissack,* 34 Miss. 464.

A patent can be assailed at law only on the ground that it was issued in violation of law. *Dickson* v. *Porter,* 23 Miss. 84; *Becker* v. *Columbia Bank,* 112 Miss. 819, 73 So. 798; 22 R. C. L., par. 89, page 342.

Each patent upon which appellee relies expressly stated that it was issued in pursuance of the provisions of the act of March 12, 1852.

The appellant asserts that these patents were issued in violation of law in that they attempted to convey lands which were not situated on Pearl river and which were reserved by the constitution of 1869 for school purposes. It is asserted that the state had no power to convey this land because the Constitution had already reserved it for school purposes. But the Constitution expressly ex-

cepted from the reservation the swamp and overflowed lands lying and situated on Pearl river. So that the direct and specific question here presented is, are the lands in question, conveyed by the patents, "lying and situated on Pearl river."

The expression "lying and situated on Pearl river," certainly means the same thing in the Act of 1852 (Ch. 34) as in the Constitution of 1868. The Act of March 12, 1852, conveyed all the swamp and overflowed lands to the commissioners of the southern district of Pearl river, describing such lands as follows: "The swamp and overflowed lands, lying and situated on Pearl river, in the above named counties, and included in the grant of such lands made by the act of Congress, of September 28, A. D. 1850, to this state."

This court held in *Bruce* v. *Jones,* 117 Miss. 207, 78 So. 9, that a sale by the State Swamp Land Commissioner, as shown by his record, reciting that it was made in accordance and upon compliance with the Laws of 1857, chapter 18, was conclusive of facts recited and divested the title of the state. And so in this case the patents recite that they were made in pursuance of chapter 34, of the Acts of 1852. And each is conclusive of the facts recited therein, and each did divest the title of the state forever to the land conveyed.

The patents relied on by the appellees were issued in 1871 and 1881. One has been outstanding for a period of over fifty years, the other over forty years. The lands represented by these patents have passed from hand to hand. Each successive purchaser relied upon their validity and paid the purchase price with the confidence that the state had conveyed its title to the patentee. This land has been bought and sold for half a century, the parties to each sale acting in good faith upon the assumed legality of the state's solemn deeds.

The public for over half a century has regarded these patents as sound, has relied upon them, and is now rely-

ing upon them. It is a sad commentary indeed upon the condition of our affairs that the state of Mississippi now, after the lapse of over half a century, after repeatedly and consistently inducing its citizens to believe in the integrity of its solemn acts, seeks to repudiate hundreds of documents to which it affixed its seal and for which it demanded the respect that becomes the dignity of state papers.

II. Chapter 34, Acts of 1852, constituted the secretary of state a special tribunal to determine what lands were embraced by the act, and his selection and list is final and conclusive as to the nature, character, and location of these lands. The case of *French* v. *Fyan* (U. S.) 23 L. Ed. 812, was a suit in ejectment, in which it was sought to prove by oral testimony that certain lands selected as swamp lands by the secretary of the interior were not in fact swamp lands within the meaning of the act of September 28, 1850. The supreme court of the United States, construing the second section of the swamp land Act, held that: "It was under the power conferred by this section that a patent was issued under which defendant holds the land. We are of opinion that this section devolved upon the secretary as the head of the department which administered the affairs of the public lands, the duty, and conferred on him the power of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling.

"We have so often commented in this court on the conclusive nature and effect of such a decision when made and evidenced by the issuance of a patent, that we can do no better than to repeat what was said in the case of *Johnson* v. *Towsley,* 13 Wall, 72, where the whole question was reviewed both on principle and authority."

In *Chandler* v. *Calumet and Hecla Mining Company* (U. S.), 37 L. Ed. 657, an ejectment suit, the supreme court of the United States held that where evidence to

show that certain lands were in fact swamp lands when the Swamp Land Act was passed, is inadmissible except in cases where there has been non-action or refusal to act on the part of the secretary of the interior in selecting the lands granted by that act.' The court further held that a patent of the United States, regular on its face, cannot in action at law be held inoperative as to any lands covered by it upon parol testimony that they were swamp and overflowed and therefore unfit for cultivation, and hence passed to the state under the Swamp Land Act. The court further held in this case that the selection by the state of Michigan of certain lands under the canal grant to that state, with the approval of the secretary of the interior and the certification of the department to the state that they were covered by that grant, is such an adjudication of the question as to exclude the introduction of parol evidence to contradict it.

In *Cohn* v. *Pearl River Lumber Company,* 80 Miss. 649, 32 So. 292, this court held that where a party claims lands by virtue of a grant from the state, evidenced by a certificate of purchase from the "Treasurer of the Swamp Land Commissioners of the Eastern District of Pearl River" and the defendant denied the existence of such grant, and the appointment of such commissioners, and the organization of such district, and it appeared that there was no authority for such district, and that it was never organized, and it was not claimed that any patent was ever issued on such certificate by the secretary of state, the certificate is insufficient to establish title, since it was incumbent on the complainant to show substantial compliance with the statute in respect to such grants. This was a suit in equity to clear title. The court intimated, at page 659, that had the claim been based upon the patent issed upon the certificate of the treasurer of the southern district of Pearl river, complainant's title would have been good.

It is not admitted that the lands here involved are remote from Pearl river. The appellees insist most stren-

uously that the lands here involved are lands "lying and situated on Pearl river" within the clear meaning of chapter 34 of the Acts of 1852, and because they were so designated by the secretary of state of the state of Mississippi when he made his list of swamp and overflowed lands on Pearl river, located within the counties of Marion, Lawrence, Hancock, Copiah, and Simpson, and in furnishing the list to the commissioners of the southern district of Pearl river. The placing of these lands upon that list made out by the secretary of state was a final adjudication that they were lands "lying and situated on Pearl river." It was the secretary of state's duty to determine whether or not they were such lands. He was expressly given this duty by the legislature. He was made a special tribunal to determine this question and he did determine it and his finding of fact is final and unassailable now in either a court of law or a court of equity.

III. The state is barred by laches. In *Aetna Insurance Company et al.* v. *Stokes V. Robertson, State Revenue Agent*, 94 So. 7, this court dealt at length with the question of laches by the state. In that opinion, by Justice COOK, all the authorities on this question are reviewed. That case was a suit for penalties for violations of the anti-trust laws which covered a period of twelve years. This court held in the original opinion that the state could recover for a period of only six years, but in a subsequent opinion held that recovery could be had only for a period of two years on account of the laches of the state. The opinion is so clear and exhaustive that I could do no better than to here quote from it at length: "In 21 C. J. 212, the following rule is announced in reference to laches: " 'It is an inherent doctrine of equity jurisprudence that nothing less than conscience, good faith, and reasonable diligence can call courts of equity into activity, and that they will not grant aid to a litigant who negligently slept on his rights and suffered his demand

to become stale where injustice would be done by granting
the relief asked.   It is therefore a general rule that laches
or staleness of demand constitutes a defense to the enforce-
ment of the right or demand so neglected.   This doctrine
has existed since the beginning of equity jurisdiction, in-
dependently of statutes of limitations, although it is more
or less affected in its operation by those statutes.   The
doctrine is based in part on the injustice that might re-
sult from the enforcement of long neglected rights, and
the difficulty, if not the impossibility, of ascertaining
the truth of the matters in controversy and doing justice
between the parties, and in part on grounds of public
policy, its aim being the discouragement, for the peace
and repose of society, of stale and antiquated demands.
The rule that the enforcement of a right may be barred by
laches in an application of the maxims, *vigilantibus, non
dermientibus, subvenient leges,* he who seeks equity must
do equity, and he who comes into equity must come with
clean hands, . . .   The defense of laches is peculiar
to courts of equity and is not pleadable in actions at
law.' "

IV.   The contentions of appellant.   1.   Appellant's ar-
gument on the first contention presented in the brief is
simply a very labored and futile effort to arrive at a
definition of the descriptive terms "lying and situated on
Pearl river" as applied to the swamp lands dealt with
by chapter 34, Acts of 1852.   The appellees' simple answer
to this is that by no amount of research and reference can
these terms be accurately and satisfactorily defined.   As
stated in all the text books, the dictionaries, Words and
Phrases and the decisions, the meaning of "on" depends
entirely upon the conditions to which it is to apply and the
circumstances which give rise to its use.   The true mean-
ing of the descriptive terms under discussion can be de-
termined only from the legislative act itself, the purposes
and objects of this legislation, the circumstances which

brought about the act and the conditions to which the act was intended to apply. The point is fully discussed elsewhere herein.

One thing is certain; the terms swamp lands "lying and situated on Pearl river" in the five counties have the same meaning in chapter 34, Acts of 1852 and in section 6, article 8, Constitution of 1868.

2. The appellant's next contention is that the lands involved in this case were set aside for school purposes by section 6, article 8, Constitution of 1868, which was adopted prior to the issuance of the patents relied upon by appellees. If the premise assumed by appellant be regarded as tenable and sound, namely that these lands are not "lying and situated on Pearl river," then this contention must prevail. But the premise is not regarded as either tenable or sound, and therefore, this contention is deemed futile and ineffective by appellees. Except as elsewhere herein answered, this is appellees' counter-argument on this point.

3. Appellant's third point is fully answered on every page of this brief save this page. This contention goes to the whole case.

The appellant in its brief, next attempts to set up and answer categorically the contentions of the appellees. But the true statement of appellees' contentions, together with argument and authorities on each, are contained in this brief and in the brief for the appellant in the companion case, and the appellees by no means are willing to adopt *verbatim* the appellant's statements of these contentions.

V. Agreed statement of facts. On page 41 of their brief, counsel for appellant, contemplating the delectable but purely illusive (here) authority of the Tynes case, shrewdly state: "It will be further observed by the court that appellees have solemnly admitted in this agreed statement of facts that the lands involved in this suit are not on Pearl river, but are on Wolf river and on Pascagoula river. . . ."

But the appellees have not admitted, do not admit, and never will admit until this court so decrees, that the lands involved in this case are not swamp lands "lying and situated on Pearl river" within the meaning and purview of chapter 34, Acts of 1852 and as designated by the secretary of state under the authority of that act.

The court is referred to the actual agreed statement of facts in the record.

VI.   Nature of act of secretary of state.   This question was elaborately briefed in *Power et al. v. Robertson,* 93 So. 769, in which this court held that the secretary of state performed a judicial act in passing upon the sufficiency of initiative petitions.   Justice ETHRIDGE said: "In our opinion it was intended to confer upon the secretary of state the power to hear evidence and decide facts. He proceeds upon inquiries and determins facts and in our judgmnt is an inferior tribunal having *quasi*-judicial powers."

VII.   Ratification.   The legislature clearly ratified chapter 34, Acts of 1852, and all acts done and patents properly issued thereunder by enacting chapter LXX, Acts of 1858 (amending chapter 34, Acts of 1852); more especially by chapter III, Acts of 1873; and chapter CLXI, Acts of 1875; and chapter XV, Acts of 1877.

The court will note that the section applies to purchases of any and all swamp lands in Hancock, Marion, Pearl, Lawrence, Simpson and Copiah counties, from "The Treasurer of the Board of Commissioners of Swamp and Overflowed lands on Pearl River."

Ratification by chapter CLXI, Acts of 1875, is clearly made by sections 1 and 2 which read: "Sec. 1.   Be it enacted by the legislature of the state of Mississippi, that the secretary of state, be, and he is hereby authorized and rquired, on or before the first day of June, next, to furnish to the assessors of the counties of Hancock, Marion, Lawrence, Simpson, Copiah and Pearl, a certified list of all

lands, describing them by proper subdivisions, sections, townships, and ranges, together with the names of patentee of all lands patented by the state of Mississippi, within their respective counties, aforesaid, since the first of January, 1865; provided, that only such lands as are situated within any of said counties shall be certified to the assessor of such county.

Section 2. Be it further enacted, that it shall be the duty of the several assessor, of said counties to assess such lands as may be certified to him (them), as aforesaid, in the manner now provided by law."

By this act the legislature ordered assessed for taxation all lands hitherto patented by the state to individuals and situated in the same five counties named in chapter 34, Acts of 1852, thereby plainly recognizing the validity of all patents to any swamp lands in these counties issued by the secretary of state under the Act of 1852.

In order for the court to say that the lands here involved are not lands "lying and situated on Pearl river" and that therefore, the patents involved are void, the court must lay down a rule defining what are lands "lying and situated on Pearl river."

If the court should say that lands twenty miles or more from Pearl river are not lands "lying and situated on Pearl river," then why could not suit be brought attacking patents similar to those here involved, alleging that lands ten miles from the river were not lands "lying and situated on Pearl river."

In conveying the title of the state, therefore, to the commissioners of the southern district of Pearl river, the legislature did not intend to confine its gift simply to lands which lay immediately contiguous to Pearl river.

The various legislative acts, the performance of official duty, the issuance of solemn patents constitute the foundation of thousands of titles in this state; let the stones of that foundation be loosened or the superstructure shaken and down again will come the integrity of the state of

Mississippi, the pride of her leaders, the hopes of her citizens, and to the ruins return the banished spectre of repudiation.

*Wells, Stevens & Jones, amici curiae,* for the appellee in Cause No. 23390, and' for the appellant in Cause No. 23309.

*S. E. Travis, amicus curiae,* for the appellee in Cause No. 23390, and for the appellant in Cause No. 23309.

Argued orally by *T. J. Wills* and *H. C. Holden* for appellee in Cause No. 23390, and for appellant in Cause No. 23309, and

*F. C. Hathorn* and *J. W. Cassedy* for appellant in Cause No. 23390, and for appellee in Cause No. 23309.

*Anderson, J.,* delivered the opinion of the court.

The case first styled above is an appeal from the circuit court of Pearl River county; the second case is an appeal from the chancery court of that county (For convenience the appellee in the first case, who is the appellant in the second, will be referred to as "the state," while the adversary parties, who are the same in each case, will be referred to as "the Hines trustees.") These cases are considered and decided together because there are questions in common, the determination of which disposes of both, rendering it unnecessary to decide any other questions involved.

Both are suits by the state for damages alleged to have been suffered by it (thirty thousand dollars in the circuit court case, and fifty thousand dollars in the chancery court case) by reason of the Hines trustees having boxed for turpentine and cut and removed a large number of valuable trees from lands owned by the state (about four hun-

dred acres in one case and about two thousand in the other), title to which it had acquired from the federal government under the Swamp Land Act of September 28, 1850. And in addition in the chancery court case there was a prayer that the title of the state to the lands involved be established and confirmed.

The Hines trustees defended on the ground that they owned the land in question and not the state, that the state had patented said lands under chapter 34, Laws of 1852 (the Pearl River Swamp Land Act) to certain persons more than forty years before the bringing of these suits, who thereby acquired the state's title to said lands, and that the Hines trustees were their successors in title by mesne conveyances.

In the circuit court case there was a directed verdict for the state for fifteen thousand dollars, which had been agreed on by the parties as the damages if the Hines trustees should be adjudged liable. In the chancery court case a decree was rendered dismissing the state's bill. From that judgmnt and that decree these appeals are prosecuted.

The state's case is that the patents to the lands involved, issued by the state under chapter 34, Laws of 1852, to the predecessors in title of the Hines trustees, are void, and therefore conveyed no title because said lands were not "lying and situated on Pearl river" as required by said act. The case of Hines trustees is that the location of said lands is a closed question; that the listing of said lands by the secretary of state to the commissioners of the southern district of Pearl river under section 7 of said act, and the sale thereof by said commissioners in pursuance of said list, followed by patents therefor issued by the Governor and secretary of state in pursuance of section 3 of said act was a final determination of the question whether said lands came within the provisions of said statute.

The controlling facts in each of these cases are the same and are as follows: The state acquired title to the lands

involved by patents from the federal government, issued under the Swamp Land Act of September 28, 1850. The predecessors in title of the Hines trustees received patents from the state to said lands under the Pearl River Swamp Land Act (chapter 34, Laws 1852). The lands involved are neither lands washed by the waters of Pearl river nor subject to the flood waters thereof, nor are they in the watershed drained by Pearl river, but are several miles away, and in a watershed drained by another stream. Said lands are now situated in Pearl River county, but prior to the formation of that county were in Marion county. The Federal Swamp Land Act provides among other things:

"To enable the several states [named in the grant] . . . to construct the necessary levees and drains, to reclaim the swamp and overflowed lands therein—the whole of the swamp and overflowed lands, made unfit thereby for cultivation, and remaining unsold on or after the twenty-eighth day of September, A. D. eighteen hundred and fifty, are granted and belong to the several states, respectively, in which said lands are situated. . . . It shall be the duty of the secretary of the interior to make accurate lists and plats of all such lands, and transmit the same to the Governors of the several states in which such lands may lie, and at the request of the Governor of any state in which said swamp and overflowed lands may be, to cause patents to be issued to said state therefor, conveying to said state the fee-simple [title] of said land. . . . In making out lists and plats of the lands aforesaid all legal subdivisions, the greater part whereof is wet and unfit for cultivation, shall be included in said lists and plats, but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom." Sections 2479 to 2481, inclusive, 8 Fed. Stat. Ann. (2d Ed.), pp. 708, 716 and 720 (U. S. Comp. St. sections 4958—4960).

Under the provisions of this Swamp Land Act the sec-

retary of the interior listed and platted the lands involved in this case as swamp and overflowed lands, and in pursuance thereof the federal government patented the same to the state, and the state owned the same on the 12th day of March, 1852, when chapter 34, Laws of 1852, was approved (the Pearl River Swamp Land Act), and for some years thereafter.

There have been several amendments made to the Pearl River Swamp Land Act, none of which makes any change in the act which materially affects the rights of the parties to this cause. The first section of that act provides among other things that the boards of police of Marion, Lawrence, Hancock, Copiah, and Simpson counties shall each appoint for their respective counties two commissioners to be known as the commissioners of the southern district of Pearl river.

The second section of the act grants these commissioners of the southern district of Pearl river, "the swamp and overflowed lands, lying and situated on Pearl river, in the above-named counties, and included in the grant of such lands made by the act of Congress of September 28th, A. D. 1850, to this State," and directs that said commissioners shall devote said lands to the purpose of reclaiming and draining said swamp and overflowed land "by ditching, levying, or removing obstacles from said river."

The third section of the act authorizes the commissioners to sell said lands for the purposes mentioned, issuing to the purchasers certificates of sale with the description of the lands sold under the seal of the said board, and provides that, upon presentation of such certificates to the secretary of state, the latter, with the Governor of the state, shall issue patents in the name of the state to such purchasers.

Section 7 of the act is in this language: "Be it further enacted, that the secretary of state is hereby required to furnish the commissioners of the southern district of Pearl river, with a list of the lands according to the field notes

133 Miss.—24

required to be furnished him by the different registers of the land officer, of lands situated in said counties on said river, and embraced in the terms of the grant of swamp and overflowed lands, made by the Congress of the United States to this state by act, approved September 28th, A. D. 1850; and also, all lands hereafter located by any agent or commissioner of the state within said counties, and on or near said river coming within the provisions of the grant aforesaid."

In considering the questions involved it will be well to have in mind certain well-established principles with reference to the construction of land patents by the Federal and state governments. A patent to land constituting part of the public domain of the sovereign is the very highest evidence of title. The Federal Government is the source from which all titles are derived (except the lands in the original thirteen states), and when through its properly constituted officers it grants a part of its public domain there can be no higher source of ownership. *Carter* v. *Spencer,* 4 How. 42, 34 Am. Dec. 106; *Sweatt* v. *Corcoran,* 37 Miss. 516; *Bledsoe* v. *Little,* 4 How. 13; 22 R. C. L., p. 270, 271, section 33.

Such a patent carries with it the presumption that all the legal prerequisites necessary to its issuance have been complied with; the presumption that the officers charged with executing land grants have performed their duties in regard to the several acts, to be done by them. *Harris* v. *McKissack,* 34 Miss. 464; *Surget* v. *Little* 24 Miss. 118; *Sweatt* v. *Corcoran, supra; Bledsoe* v. *Little, supra; Carter* v. *Spencer, supra.*

A patent to land issued by the sovereign cannot be questioned either in a court of law or equity, except on the ground of fraud or mistake. *Carter* v. *Spencer, supra; Sweatt* v. *Corcoran, supra.*

Unquestionably the grant made in this case by the state to the commissioners of the southern district of Pearl river was for public purposes. It was made for

the purpose of providing funds for the reclamation of the swamp and overflowed lands on Pearl river in said five counties. A grant of land by the state to a functionary of the state, to be used for public purposes, is to be liberally and not narrowly construed. *Board of Commissioners of Vigo County* v. *Davis,* 136 Ind. 503, 36 N. E. 141, 22 L. R. A. 515, 517, 518; *U. S.* v. *D. & R. Railroad Co.,* 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975, 979.

It will be observed that the grant of these lands by the state to the swamp land commissioners of the southern district of Pearl river was for exactly the same purpose as the grant from the Federal government of said lands to the state; namely, for the purpose of reclaiming such swamp and overflowed lands. The grant from the Federal government to the state describes the lands as swamp and overflowed lands, while in the grant from the state to the commissioners of the southern district of Pearl river they are described as swamp and overflowed lands lying and situated on or near Pearl river. However, section 2481 of the Federal Swamp Land Act, 8 Fed. Stat. Ann. (2 Ed.), p. 720, defines what is meant by that act by the terms "swamp" and "overflowed" lands, as lands, "the greater part whereof is wet and unfit for cultivation." The course of dealing of the Federal government with the lands granted the states under the Swamp Land Act of September 28, 1850, throws light on the question as to what the legislature meant in the Pearl River Swamp Land Act by the terms "swamp" and "overflowed" lands on or near Pearl river. According to the common understanding "swamp and overflowed lands" are very restricted terms; they simply mean the bottom lands subject to overflow by the flood waters of the stream on which they are situated, or lands rendered wet and swampy by their proximity to such flooded lands; in other words, the bottom lands on or near the stream. This was substantially the definition given by the Federal Swamp Land Act as above shown.

But that act was not so construed either by the officials of the federal government or of this state in dealing therewith, as is evidenced by the fact that under the grant the state received patents to large bodies of land as swamp and overflowed lands on Pearl river, which were neither flooded by the waters of that river nor affected thereby in any manner whatsoever, nor adjacent to such flooded or affected lands, but in the hills and valleys often far removed therefrom, and in some instances (as is true of the lands here involved) located in other watersheds of streams of minor importance. A liberal construction was given the grant, not a narrow one. These lands were of practically no value to the Federal government, but it was thought that they could be made very valuable to the states in which they were located. It was utterly impracticable for the act of Congress making the grant to undertake to describe by metes and bounds the lands intended to be granted, and this was equally true with reference to the grant by the state to the commissioners of the southern district of Pearl river. The lands had to be described in general terms, and the selection, listing, and patenting had to be intrusted to an administrative agency. If these grants had not been given a liberal construction by the state and Federal authorities dealing therewith they would have been wholly inadequate to accomplish the purpose for which they were intended, namely, the reclaiming of the swamp and overflowed lands by means of "levees and drains." How far would the strictly bottom lands of Pearl river, not already patented to others by the Federal government when the Federal Swamp Land Act was passed, have gone in accomplishing this purpose? It is evident that such lands would not have furnished the means of making more than a start to that end. The terms of the national act defining swamp and overflowed lands to be lands "wet and unfit for cultivation," meaning of course by reason of being flooded or affected by the waters of some stream, are terms more restricted in meaning

than the terms "swamp and overflowed lands lying and situated on or near Pearl river," used in the Pearl River Swamp Land Act.

The legislature provided in chapter 13, Laws of 1852, a scheme by which it was sought to largely increase the quantity of lands available to the state under said Federal Swamp Land Act. It provided for the appointment of agents with authority to negotiate with the Department of Interior, Surveyor General's office, and registrars of land offices in this state, with a view of having the national government patent to the state other and additional lands to those shown by the field notes in the different land offices in this state, or by the field notes in the General Land Office at Washington to be swamp and overflowed. (Section 5 of said act.) And these special agents for this purpose, as provided in section 3 of the act, were to receive as compensation for their services ten dollars for every section for which they obtained a patent for the state, and at the same rate for any fraction not amounting to a section. In other words, this statute evidences a legislative plan to induce the Federal government to give a very broad meaning to the terms "swamp and overflowed lands." And that was done. The Governor, secretary of state and the commissioners of the southern district of Pearl river, following the example of the Federal government with reference to said act of Congress of September 28, 1850, gave said Pearl River Swamp Land Act a most liberal construction in favor of the grantees of the lands covered thereby. Why, therefore, should not one be construed by the courts as liberally as the other?

The Pearl River Swamp Land Act constituted the secretary of state a special tribunal to determine what lands were embraced in the grant to the commissioners of the said Pearl River district, as may be done under our Constitution (*Jackson County* v. *Neville,* 131 Miss. 599, 95 So. 626); and the selection, listing, and patenting of said lands by the secretary of state to said commissioners

and their grantees is conclusive as to the character and location of said lands, and as to whether they come within the terms of said act, unless there was fraud or mistake in such listing and patenting.  By this act substantially the same powers were conferred upon the secretary of state as were conferred upon the secretary of the interior by the Federal Swamp Land Act.

In *French* v. *Fyan,* 93 U. S. 169, 23 L. Ed. 812, the Supreme Court, in construing the Federal Swamp Land Act of 1850, held that a patent to land granted under the authority of said act was evidence that the lands had been properly identified as such and related back and gave title to such lands as of date of the act, and superseded any subsequent title granted by the United States, that by said act it was made the duty of the secretary of the interior and the power was conferred upon him to determine what were swamp lands as defined in said act, and that the determination of the secretary of the interior that any lands were swamp lands under said act was conclusive (except from attack for fraud or accident in the proper tribunal), and parol evidence would not be heard to the effect that the land patented was never in fact swamp and overflowed land.  Rose's notes to this case, as found in 9 Rose's Notes on U. S. Rep., pp. 311-318, contains notes of the decisions of the supreme court of the United States on this question.  The consensus of the cases referred to in said notes is that the action of the secretary of the interior under said Swamp Land Act, in selecting and patenting lands to the states entitled thereto under the provisions of said act, is an adjudication of the matter, that he is constituted a special tribunal with *quasi*-judicial powers to pass on the question whether lands under said act are swamp and overflowed lands, and that his action is unassailable, except for fraud or mistake.  The holding of this court is substantially to the same effect. *Carter* v. *Spencer, supra; Sweatt* v. *Corcoran, supra.*

There is no pretense on the part of the state that any

fraud was practiced by the Governor and secretary of state and the commissioners of the southern district of Pearl river in listing, selling, and issuing patents for these lands, nor is there any grounds shown why said patents should be set aside on the ground of mistake, except it appears that said lands are not in fact on Pearl river according to the present common use of those terms. If fraud or mistake is shown, it consists simply in the fact that the state authorities in construing the Pearl River Swamp Land Act pursued exactly the same liberal policy as the Federal government did in construing its Swamp Land Act. No one could have been deceived. If fraud was perpetrated, by whom was it perpetrated? If by accident or mistake the lands were not on Pearl river, at whose door should the fault be laid? If the Commissioners of the Pearl river district and the secretary of state and the Governor got all the land they could under said act for the commissioners of said district, the state authorities were only doing with reference to said Pearl river district what the state authorities in connection with the Federal authorities had done for the state in construing the Federal Swamp Land Act. It must be remembered that the Federal government is the source of title through whom both the state and the Hines trustees claim this land. If the Pearl River district perpetrated a fraud upon the state, then the state perpetrated exactly the same sort of fraud upon the Federal government. If there was accident or mistake on the part of the officials in carrying out the grant of the state to the Pearl River district, then the same kind of accident or mistake took place in carrying out the grant from the Federal government to the state government. If the state got its patents from the Federal government as a result of fraud, accident, or mistake, it seems it would not be very high morals for the state to complain that its patents to this land had been gotten by the Pearl River district by virtue of the same character of fraud, accident, or mistake.

However, if there were any doubt about this question it seems that such doubt would be set as rest by section 1, chapter 44, Laws of 1890, which reads as follows:

"Be it enacted by the legislature of the state of Mississippi, that it is hereby made the duty of the attorney-general of the state to institute without unnecessary delay, in the chancery court of the first district of Hinds county, which shall have jurisdiction without regard to the locality of the lands or residence of defendants, legal proceedings to cancel all entries of swamp and overflowed lands which, in his opinion, were made in violation of law and where the interest of innocent purchasers under said fraudulent entries do not intervene to prevent such cancellation."

It will be observed that this statute made it the duty of the attorney-general to institute suits without delay in the chancery court of Hinds county to cancel all entries of swamp and overflowed lands which in his opinion were made in violation of law, *"and where the interest of innocent purchasers under said fraudulent entries do not intervene to prevent such cancellation."*

If this statute did not go to the extent of ratifying and confirming every patent issued for swamp and overflowed lands by the state, regardless of whether the same had been procured by fraud, accident, or mistake, provided the rights of innocent purchasers had intervened, then certainly it went to the extent of being a declaration of the legislative policy of this state to that effect. It seems that this act simply confines the powers of the attorney-general to proceedings to cancel patents procured by fraud. There is no pretense of a showing in these cases that the Hines trustees are not innocent purchasers.

It is argued that, under the provisions of section 6, article 8, of the Constitution of 1868, which provides among other things that there shall be established a common school fund which shall consist "of the proceeds of lands now belonging to the state, heretofore granted by the

United States, and of the lands known as 'swamp lands,' except the swamp lands lying and situated on Pearl river, in the counties of Hancock, Marion, Lawrence, Simpson and Copiah," etc., as construed by *Tynes* v. *Southern Pine Co.,* 100 Miss. 129, 54 So. 885, these patents are void. As we understand that case the question on which these cases turn was not decided. In effect it was agreed by the parties to that suit that the lands in question did not come within the provisions of the Pearl River Swamp Land Act —that they were not on or near Pearl river within the meaning of that act. The demurrer to the bill admitted that. Therefore the court held that the defendant admitted itself out of court. We do not look upon that case as authority for the contention of the state. The purpose of the constitutional provision in question is plain enough; it expressly excluded from its operation the lands involved in these causes, provided they came within the provisions of the Pearl River Swamp Land Act as we hold that they do. And furthermore the court did not have before it in that case chapter 44, Laws 1890, above referred to.

Both the Federal and state officials, in constructing the swamp land grants of their respective governments, proceeded upon the idea that it took not only the swamp and overflowed lands to accomplish the purposes intended but in addition the outlying hills and valleys, and in some instances the lands beyond the crest of the hills in other watersheds. This construction has been too long acquiesced in to be now disturbed by the courts; the consequences of its overturning at this late day would be too disastrous to innocent purchasers.

It follows from these views that the circuit court case is reversed and dismissed, and the chancery court case is affirmed.

Reversed and dismissed as to the first case, and affirmed as to the latter.

*Reversed and dismissed.*
*Affirmed.*